**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

<table>
<tr><td>

ROBERT ASTACIO, II,

           Plaintiff,

v.

EAST BRUNSWICK HIGH SCHOOL, *et al.*,

           Defendants.

</td><td>

Civil Action No. 16-938 (MAS) (LHG)

**MEMORANDUM OPINION**

</td></tr>
</table>

**SHIPP, District Judge**

This matter comes before the Court upon Defendants East Brunswick High School ("EBHS"), Omar Beltran, Sarah DiMaggio-Forte, Ileana Knable, and Audrey Nelson's ("Individual Defendants")[1] Motion for Summary Judgment.[2] (ECF No. 49.) Plaintiff opposed (ECF No. 60), and Defendants replied (ECF No. 64).[3] Plaintiff also filed a Motion to Strike certain statements in Defendants' SUMF (ECF No. 63), which Defendants opposed (ECF No. 65), and

---

[1] During the time in question, Individual Defendants served in the following roles at EBHS: Defendant Ileana Knable ("Knable") was a Student Assistance Specialist; Audrey Domond (née Nelson) ("Nelson") was Plaintiff's English teacher, and taught Plaintiff's American Literature class; Defendant Juan Omar Beltran ("Beltran") was Plaintiff's guidance counselor; and Sarah DiMaggio Forte ("DiMaggio Forte") was an assistant principal at EBHS. (Compl. ¶¶ 2-4.)

[2] The Court refers to EBHS and Individual Defendants collectively as "Defendants".

[3] Defendants and Plaintiff submitted attendant Statements of Material Facts (ECF Nos. 49-3, 62), which this Court refers to as Defendants' SUMF and Plaintiff's CSMF. Defendants also submitted a Response to Plaintiff's CSMF (ECF No. 64-1) "should the Court [choose] to entertain . . . [P]laintiff's submission . . . ." (Defs.' Reply Br. 3, ECF No. 64.) The Court refers to Defendants' responsive submission as Defendants' RSMF.

Plaintiff replied (ECF No. 66).[4]

The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, the Court grants Defendants' Motion for Summary Judgment.

I. **Background**

Plaintiff filed his initial Complaint in February 2016. (Compl., ECF No. 1.) Defendants moved to dismiss Plaintiff's Complaint (Defs.' First Mot. to Dismiss, ECF No. 3), and the Court denied Defendants' motion as to Counts One and Two, finding Plaintiff successfully pled a violation of the First Amendment and Due Process Clause of the Fourteenth Amendment. (Oct. 13, 2016 Hr'g Tr. 27:24 to 33:14, ECF No. 23; Oct. 18, 2019 Order, ECF No. 16.) The Court dismissed with prejudice several of Plaintiff's claims, dismissed without prejudice Plaintiff's New Jersey Law Against Discrimination ("NJLAD") claim, and granted Plaintiff leave to amend. (*Id.*) Subsequently, Plaintiff filed an Amended Complaint (Am. Compl., ECF No. 21), which Defendants also moved to dismiss (Defs.' Second Mot. to Dismiss, ECF No. 22).

In its July 7, 2017 Opinion, the Court again dismissed without prejudice Plaintiff's NJLAD claim, however, Plaintiff did not file another amended complaint addressing the deficiencies the Court identified. (July 7, 2017 Letter Op., ECF No. 29; July 7, 2017 Order, ECF No. 30.)

---

[4] Plaintiff's Motion to Strike portions of Defendants' SUMF alleges that many of the statements in Defendants' SUMF are immaterial, constitute opinion rather than fact, or are inadmissible at trial. (*See e.g.*, Motion to Strike 2-3, 7, ECF No. 63.) Plaintiff, however, fails to cite any relevant Third Circuit case law or binding legal authority to support his motion. (*See generally id.*) The Court, accordingly, denies Plaintiff's Motion to Strike. The Court, however, is mindful that "disputes over facts that might affect the outcome of the suit under the governing law will . . . preclude the entry of summary judgment," and acknowledges Plaintiff's opposition to certain portions of Defendants' SUMF. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Therefore, although the Amended Complaint remains the operative pleading, the only surviving counts are Counts One and Two.

The following facts are not in dispute unless otherwise noted.[5] This action arises from events that took place during Plaintiff's tenth-grade year at EBHS. (Defs.' SUMF ¶ 1.) Plaintiff was at risk of failing his American Literature class. (*Id.* ¶¶ 8-9.) In an Intervention and Referral Services form dated March 20, 2014, Nelson[6] included the following three remarks regarding Plaintiff's behavior: "displays little energy"; "isolated – no interaction with peers"; "very passive, silent in discussion". (*Id.* ¶ 11; Nelson Aff., Ex. B, ECF No. 49-7.) On or around April 28, 2014, Plaintiff and his mother met with certain Defendants regarding Plaintiff's academic performance.[7] (Defs.' SUMF ¶ 12.)

On or around May 1, 2014, Plaintiff gave Nelson a short story entitled, "Russian Sleep Experiment" (the "Story"). (*Id.* ¶ 13; *See also* Nelson Aff., Ex. C (the "Story").) The Story depicts "political prisoners" upon whom researchers experimented by depriving the prisoners of sleep. (Story 1.) After numerous days of sleep deprivation, the prisoners resorted to self-inflicted harm. (*Id.* at 3-4.)

According to Nelson, the Story was "unsolicited" and "unrelated to any assignment or reading material in class." (Nelson Aff. ¶¶ 11-12; *see also* Defs.' SUMF ¶ 14.) Plaintiff, however, states that he submitted the Story as an extra credit assignment, which Nelson assigned to Plaintiff one to two days prior to his submission. (Defs.' Moving Br., Ex. D., ("Astacio Dep. Tr.") 16:15-

---

[5] For unopposed material facts, the Court cites only to Defendants' SUMF.

[6] Although Defendant Nelson changed her last name to Domond following this action's initiation, the Court continues to use Nelson for continuity. (*See* Nelson Aff. ¶ 3.)

[7] Plaintiff disputes this fact to the extent Defendants imply that "Plaintiff's alleged 'lack of energy, passivity, []or isolation from peers'" was discussed at that meeting. (*See* Pl.'s CSMF ¶ 12.)

17:16, ECF No. 49-6; Defs.' SUMF ¶ 15.)  Plaintiff states he believed the Story was related to another story Plaintiff was reading in his American Literature class at that time—The Fall of the House of Usher by Edgar Allan Poe. (Astacio Dep. Tr. 18:23 to 19:5; Defs.' SUMF ¶ 16.)  Plaintiff did not personally write the Story; rather, he found it on the internet.  (Astacio Dep. Tr. 18:10-13; Defs.' SUMF ¶ 17.)

According to Defendants, Nelson "does not offer any extra credit assignments to students who fail to complete regular class work or perform poorly on tests or quizzes." (Defs.' SUMF ¶ 19; Nelson Aff. ¶ 7.)  Plaintiff admits that assertion, but denies its materiality, and further states that Nelson's affidavit fails to "state that [Nelson's] policy was known to the class or to [Plaintiff] personally prior to his handing in the" short story. (Pls.' CSMF ¶ 19.)

According to Nelson, Plaintiff's submission of the Story caused her concern, and she shared that concern with Beltran. (Nelson Aff. ¶¶ 10, 12; See Defs.' SUMF ¶ 21.)[8]  Beltran then consulted with Knable about Plaintiff's decision to submit the Story. (Defs.' SUMF ¶ 23.)[9]

The East Brunswick School District maintains a "Pupil Suicide Prevention" policy. (Defs' Moving Br., Ex. A (the "Policy").)  The Policy provides, in pertinent part:

> All school personnel, both teaching staff members and support staff members, shall be alert to any sign that a pupil may be contemplating suicide . . . .
>
> . . . .
>
> Any indication of a potential suicide, whether personally witnessed or received by report from another, must be taken seriously and must be reported to the principal or his/her designee who will in turn contact the suicide intervention core team (*i.e.* nurse, guidance counselor, child study team representative(s), student assistance

---

[8] Plaintiff admits that Nelson spoke to Beltran, but states he cannot admit or deny the remainder of the assertion because it constitutes an expression of opinion. (*See* Pl.'s CSMF ¶¶ 21-22.)

[9] Plaintiff admits that the meeting between Beltran and Knable took place. (Pl.'s CSMF ¶ 23.)

specialist and administrator) who shall investigate the matter promptly and conduct such initial assessment as may be appropriate.

. . . .

. . . The counselor, student assistance specialist, psychologist or social worker, upon receiving notification of a pupil at risk for suicide, will in conjunction with another member of the suicide prevention core team:

. . . Perform an initial assessment for lethality (seriousness of intent, ability and means to perform the act, etc.).

. . . .

. . . In cases where the counselor has assessed a high or questionable degree of risk, the principal or his/her designee shall:

. . . Insist that a parent/guardian or his/her designee must come to school for the pupil and accompany his/her child to Children Crisis Intervention Services at UMDNJ or an equivalent agency or provider for the purpose of a suicide lethality assessment.

(*Id.* 2-3 (italics added).)

In accordance with the Policy, Knable and Beltran met with Plaintiff and performed an initial risk assessment, during which Knable and Beltran discussed the Story with Plaintiff and inquired into what prompted Plaintiff to submit the Story. (Defs.' SUMF ¶ 24; *see also* Defs.' Moving Br., Ex. B ("Knable Dep. Tr.") 14:23-15:6.) Defendants contend that "[w]hen asked why he submitted the [Story], Plaintiff could not provide clear answers to explain his behavior other than stating, with a smile, that he wanted to scare . . . Nelson." (Defs.' SUMF ¶ 28.) Defendants also state that "Plaintiff became atypically engaged and animated" when he was describing the details of the Story to Beltran and Knable. (*Id.* ¶ 27.) Plaintiff states he can neither admit nor deny those two assertions because they constitute statements of opinion rather than fact. (Pl.'s CSMF ¶¶ 27, 28.)

Ultimately, Knable and Beltran found they were unable to "make a clear determination as

to whether Plaintiff was at risk of hurting himself and/or others," and therefore required Plaintiff to visit a mental health professional before they would allow Plaintiff to return to school. (Defs.' SUMF ¶¶ 35-36; Defs.' Motion for Summ. J., Ex. B ("Removal Correspondence"), ECF No. 49-8.)

Defendants notified Plaintiff's mother about their determination, and when Plaintiff's mother arrived at the school, Defendants provided her with standardized Removal Correspondence, which stated in pertinent part:

> We are concerned about the safety of your child . . . . Our student services personnel have informed me that he is at risk of harming himself. Our policy requires that you have your child screened by a mental health professional as soon as possible to determine if and when he may safely return to school. Once I have received clearance from a mental health professional stating he is not a threat to himself, your child will be readmitted to school.

(Removal Correspondence; Defs.' SUMF ¶ 45.) Plaintiff's mother brought Plaintiff directly to Rutgers University Behavioral Health Care, and a mental health professional cleared Plaintiff to return to school that same day. (Defs.' SUMF ¶¶ 53-55, 59.) Thus, Plaintiff was cleared to return to school on May 1, 2014—the same day Defendants removed him from school. (*Id.* ¶ 56.)

Plaintiff returned to school on May 2, 2014, and Beltran and Knable held a re-entry conference with Plaintiff and his mother. (*Id.* ¶ 58.) "EBHS [then] accepted the mental health clearance Plaintiff obtained as satisfactory and allowed [Plaintiff] to return to school." (*Id.* ¶ 61.) Plaintiff does not recall missing any classwork or whether the May 1, 2014 incident affected his grades. (*Id.* ¶¶ 62-63.) Subsequent to graduating from EBHS, Plaintiff joined the United States Air Force, and served in the Air Force for one year and five months. (*Id.* ¶ 69.)

## II.   **Legal Standard**

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The substantive law identifies what facts are

6

material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (citation omitted).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *See Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court will not "weigh the evidence and determine the truth of the matter," but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249. Although the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial." *Id.* at 250. The Court must grant summary judgment if the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists. *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992) (citation omitted). Furthermore, "a party does not raise a genuine [dispute] of material fact by speculation and conclusory allegations." *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 209 (D.N.J. 2001).

## III.  **Discussion**

Count One is captioned, "Federal Statute 42 U.S.C. [§] 1983," and provides, in pertinent part, "The conduct of Defendants, as aforesaid violated the policies of EBHS under color of law, and constitutional rights of Plaintiff, including due process, and constituted deviations from accepted standards." (Am. Compl. ¶ 66.) Count Two is captioned, "Violations of Due Process," and provides, in pertinent part, "Defendants wrongfully acted toward Plaintiff and expelled him

from school without any due process in violation of the [United States] Constitution . . . ." (*Id.* ¶ 69.)

Defendants address both counts as a single claim, alleging that Counts One and Two are duplicative because Section 1983 does not create substantive rights but rather is a vehicle for raising violations of the United States Constitution and federal law. (Defs.' Moving Br. 4-5.) Although the Court agrees that Section 1983 does not create substantive rights, *see Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996), the Court construes Plaintiff's Amended Complaint as raising a First Amendment claim,[10] a procedural Due Process claim, and a substantive Due Process claim. The Court, however, finds Plaintiff's Amended Complaint does not raise a claim pursuant to Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c, *et seq.* ("Title IV"), and therefore, declines to address Plaintiff's Title IV arguments, which were raised for the first time in his opposition brief.[11] *See Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d Cir. 2008) (internal quotation marks and citation omitted) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). (*See, e.g.*, Pl.'s Opp'n Br. 11.)

---

[10] Regarding Defendants' first Motion to Dismiss Plaintiff's Complaint, the Court denied dismissal of Plaintiff's Count One and found Plaintiff sufficiently put Defendants on notice of a First Amendment claim even though the Complaint only cited a violation of Section 1983. (*See* Oct. 13, 2016 Hr'g Tr. 29:5-15.)

[11] This Court previously dismissed without prejudice Plaintiff's NJLAD claim, finding Plaintiff failed to plead sufficient facts to demonstrate an inference of discrimination due to Plaintiff's religion and ancestry. Plaintiff abandoned those claims when he failed to file a second amended complaint. Although Plaintiff now appears to argue in his opposition brief that Defendants violated Title IV, this claim relies on the same facts that the Court previously found deficient; *i.e.* discrimination due to Plaintiff's religious affiliation as an Egyptian Orthodox Christian and his Middle Eastern descent. (Oct. 13, 2016 Hr'g Tr. 32:16-18 ("Plaintiff has failed to plead enough facts to create an inference of discrimination based on his religion and ancestry."); July 6, 2017 Letter Op. 1, ECF No. 29 ("Plaintiff now re-pleads the same allegations of discrimination . . . and has failed to make any changes to his pleading beyond superficial changes . . . .").) Moreover, neither Count One nor Count Two references Title IV.

## A.    Plaintiff's First Amendment Claim

A tenet of the First Amendment's application in public schools is that students and teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also Layschock v. Hermitage Sch. Dist.*, 650 F.3d 205, 212 (3d Cir. 2011). Although the Supreme Court has held that students' First Amendment rights are protected within public schools, "it also recognized that the unique nature of the school environment had to be part of any First Amendment inquiry." *Layschock*, 650 F.3d at 212. Thus, the Supreme Court acknowledged a "need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in schools." *Id.* (quoting *Tinker*, 393 U.S. at 507).

In the instant matter, Defendants argue they are entitled to summary judgment on Plaintiff's First Amendment claim because they had sufficient reason to suspect Plaintiff was at risk of harming himself; thus, they contend, by removing Plaintiff from the school and requiring him to receive a mental health evaluation, they were merely fulfilling their duty to prevent violence on school grounds. (Defs.' Moving Br. 28-29, 31.) Defendants further contend that although the Story's content "was admittedly a factor in the decision to remove Plaintiff [from EBHS] pending clearance from a mental health professional, there is undisputed evidence in the record that Defendants decided to remove [Plaintiff] because of other factors beyond the . . . [S]tory itself," including Plaintiff's inability to explain why he submitted the Story in the first place. (*Id.* at 30.) Defendants also aver that Plaintiff failed to establish that the conduct at issue—*i.e.*, Plaintiff "handing a teacher a short story that he did not write, interpret, analyze[,] or advocate"—constitutes an expression of speech. (Defs.' Reply Br. 7.)

9

In opposition, Plaintiff argues that Defendants' actions were based on the content of the Story, and therefore, precedent dictates that Defendants must demonstrate they had a compelling interest in removing Plaintiff from school, which according to Plaintiff, they did not. (Pls.' Opp'n Br. 9.) Plaintiff further argues that, assuming Defendants did have a compelling interest in removing Plaintiff, "[t]he summary removal of Plaintiff from the school without reasonable notice to his parents" is not narrowly tailored to meet that interest. (*Id.*)

As a threshold matter, the Court must first determine whether Plaintiff's action constituted expressive conduct such that it is entitled to constitutional protection. *See, e.g.*, *Spence v. Washington*, 418 U.S. 405 (1974) (per curiam); *Texas v. Johnson*, 491 U.S. 397 (1989); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557 (1995); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1741-46 (2018) (Gorsuch, J., concurring, Alito, J. joining). The Supreme Court has provided that "[t]he First Amendment literally forbids the abridgment only of 'speech,' but . . . its protection does not end at the spoken or written word." *Johnson*, 491 U.S. at 404. Rather, "conduct may be sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Id.* (citation omitted). Notably, however, "[n]ot all conduct . . . is expressive for purposes of the First Amendment." *Troster v. Pa. Dep't of Corr.*, 65 F.3d 1086, 1094 (3d Cir. 1995) (citation omitted).

In determining whether conduct constitutes protected speech under the First Amendment, the Third Circuit has adopted the following standard:

> [C]onduct is expressive if, considering the nature of the activity, combined with the factual context and environment in which it was undertaken, [the Court is] led to the conclusion that the activity was sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.

*Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 160 (3d Cir. 2002), *cert. denied*, 539 U.S. 942 (2003) (internal citation marks omitted) (quoting *Spence*, 418 U.S. at 409-410) (discussing

modification to the *Spence-Johnson* factors and setting forth a modified standard for determining what conduct constitutes an expression of speech); *see also Fields v. City of Phila.*, 862 F.3d 353, 358 (3d Cir. 2017).

"This is a fact-sensitive, context-dependent inquiry, and . . . the putative speaker bears the burden of proving that his or her conduct is expressive." *Tenafly*, 309 F.3d at 160 (internal quotation marks and citation omitted). "Whether the plaintiff's speech was protected is a question of law appropriate for the court to decide on summary judgment." *Sokol v. Reading Regional Airport Auth.*, No. 99-11, 2000 U.S. Dist. LEXIS 8735, at *8 (E.D. Pa. May 25, 2000) (citing *Azzaro v. Cty. of Allegheny*, 110 F.3d 968, 975 (3d Cir. 1997)) (discussing First Amendment retaliation claims, but noting that in establishing those claims, "the plaintiff must first show that he [or she] engaged in conduct or speech that is protected by the First Amendment").

"[C]onduct does not qualify as protected speech simply because 'the person engaging in [it] intends thereby to express an idea.'" *Masterpiece Cake Shop, Ltd.*, 138 S. Ct. at 1742 (internal citation omitted) (quoting *United States v. O'Brien*, 391 U.S. 367, 376 (1968)) (Thomas, J., concurring, Gorsuch, J. joining, concurring in part and concurring in judgment). Rather, "to determine whether conduct is sufficiently expressive, the Court asks whether it was 'intended to be communicative' and, 'in context, would reasonably be understood by the viewer to be communicative.'" *Id.* (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984)). A "particularized message," however, is not required. *Id.* (quoting *Hurley*, 515 U.S. at 569)).

Here, the parties do not dispute that Plaintiff did not write the Story. (Defs.' SUMF ¶ 17.) Moreover, there is no dispute that when Plaintiff submitted the Story, he did not provide Nelson with "anything else, such as an analysis or summary." (*Id.*) In fact, the record lacks any indication that Plaintiff ever discussed the substance of the Story with Nelson prior to, contemporaneous

with, or following Plaintiff's submission of the Story. (*Cf.* Astacio Dep. Tr. 19:12-25; 59:25-60:2.) According to Defendants, "When asked why he submitted the article, Plaintiff could not provide clear answers to explain his behavior other than stating, with a smile, that he wanted to scare . . . Nelson." (Defs.' SUMF ¶ 28.) Plaintiff disputes that assertion, arguing it constitutes opinion, not fact. (Pl.'s SUMF ¶ 28.)

Plaintiff has failed to demonstrate that the mere act of submitting a story that he found on the internet is inherently expressive or "sufficiently imbued with elements of communication" such that it constitutes speech under the First Amendment. In fact, the instant conduct falls far below conduct the Supreme Court has recognized as expressive, such as marching in a parade, burning the American flag, flying an upside-down American flag adorned with a peace-sign, and performing a silent protest. *See Hurley*, 515 U.S. at 570; *Johnson*, 491 U.S. at 420; *Spence*, 418 U.S. at 406; *Brown v. Louisiana*, 383 U.S. 131, 141-42 (1966); *see also Tenafly Eruv Ass'n*, 309 F.3d at 159 (collecting cases).

The Court finds persuasive *Cunningham v. New Jersey*, 452 F. Supp. 2d 591 (D.N.J. 2006). In *Cunningham*, the plaintiff, a registered nurse, was employed as an HIV specialist and provided "counseling and education" to inmates at Bayside State Prison. *Id.* at 592. An inmate told the plaintiff he had not yet received medical records that he had previously requested from the organization responsible for maintaining his records. *Id.* The plaintiff obtained the medical records herself, and then gave them to the inmate. *Id.* The plaintiff did not collect money from the inmate despite her knowledge "about a prison policy requiring inmates to pay for copies of their medical records." *Id.* at 593. The prison determined that the plaintiff's actions violated its policy, and therefore "withdrew its permission for her to enter its facility." *Id.*

The *Cunningham* court determined that the plaintiff's actions were distinguishable from conduct the Supreme Court and Third Circuit have found expressive, providing:

12

> Forms of protected conduct include flag burning, affixing a peace symbol to an American flag, donning military uniform in a theatrical production, wearing black armbands, saluting the American flag, and displaying a symbolic flag.... These examples involve well-known communicative behavior or distinctive attire. While such behavior or dress is not a prerequisite to gain the protection of the First Amendment, these actors conveyed their subjective intent to communicate via conduct that had the unmistakable connotation of expression.

*Id.* at 595. The *Cunningham* court ultimately found that the plaintiff providing the inmate with his medical files was not expressive conduct warranting First Amendment protection. *Id.* at 595-96 ("To a reasonable bystander, nothing about retrieving a patient's medical record and handing it to him conveys a particular message."). Similarly, here, the Court finds a reasonable fact-finder would not find Plaintiff's act of merely printing a short story and handing that story to his teacher inherently expressive because such conduct does not include well-known communicative behavior, distinctive attire, nor is it suggestive of any inherent expression.

Plaintiff's alleged statement that he wanted to scare Nelson does not alter the Court's analysis. The conduct at issue is Plaintiff's submission of the Story—conduct which, as the Court previously provided, is not in and of itself "inherently expressive." *See, e.g., Rumsfeld v. Forum for Academic & Inst. Rights, Inc.*, 547 U.S. 47, 66 (2006) ("We rejected the view that conduct can be labeled speech whenever the person engaging in the conduct intends thereby to express an idea.... Instead, we have extended First Amendment protection only to conduct that is inherently expressive."). Plaintiff's alleged statement would merely be speech explaining his actions, which does not transform non-expressive conduct into expressive conduct. *See id.* at 66 (determining that the subject action did not constitute speech because "[t]he expressive component of [the] ... action[] [was] not created by the conduct itself but by the speech that accompanie[d] it"). In fact, "that such explanatory speech is necessary is strong evidence that the conduct at issue ... is not so inherently expressive that it warrants protection ...." *See id.*

Here, Plaintiff's submitting the Story was not inherently expressive, and any imputed expression would be the result of Plaintiff's alleged explanation for his action (*i.e.*, stating he wanted to scare Nelson).[12] Plaintiff's alleged commentary is insufficient to transform his conduct into expressive speech, and therefore, Plaintiff failed to demonstrate that his actions constitute speech that is protected by the First Amendment. Accordingly, because the record does not reflect that Plaintiff engaged in protected speech, Plaintiff's First Amendment claim fails.

**B.    Plaintiff's Procedural Due Process Claim**

To prevail on a procedural due process claim, "a plaintiff must allege that[:] (1) he [or she] was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property; and (2) the procedures available to him [or her] did not provide due process of the law." *Chambers v. Sch. Dist. of Phila Bd. of Educ.*, 587 F.3d 176, 194 (3d Cir. 2009) (internal quotation marks and citation omitted). In evaluating Plaintiff's claims, the Court must "first determine whether the asserted individual interests are encompassed within the [F]ourteenth [A]mendment's protection of life, liberty, or property." *Id.* (citation omitted). "[A] negligent deprivation of due process will not sustain a [Section] 1983 claim"; rather, "a plaintiff who wishes to sustain a [section] 1983 claim based upon a violation of procedural due process must, at a minimum, prove recklessness or 'gross negligence' . . . ." *Id.* at 196 (quoting *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1277 (3d Cir. 1994)). In some circumstances, a plaintiff must "show a deliberate decision to deprive [him or her] of due process." *Id.* (citation omitted).

---

[12] The fact that Plaintiff disputes Defendants' assertion that Plaintiff could not provide a sufficient explanation for his actions and stated he wanted to scare his teacher does not preclude summary judgment. Because Plaintiff's alleged explanation and response does not transform Plaintiff's non-expressive conduct into expressive conduct, the assertion is immaterial.

Defendants aver that Plaintiff is unable to demonstrate either prong required to demonstrate a viable procedural due process claim. (Defs.' Moving Br. 7-15.) The Court addresses those arguments in turn.

### 1. Whether Plaintiff was Deprived of an Educational Benefit

Defendants concede Plaintiff had a legitimate property interest in receiving a free and public education in New Jersey under the New Jersey constitution. (Defs.' Moving Br. 10 (citing *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *M.G. v. Crisfield*, 547 F. Supp. 2d 399, 408 (D.N.J. 2008)).) Defendants, however, argue Plaintiff was not deprived of that interest because he was neither suspended nor expelled from EBHS. (*Id.* at 11.) Rather, Defendants contend that although Plaintiff was removed from EBHS, he was free to return to the school whenever he wanted so long as he obtained a mental health clearance; to wit: Defendants aver that Plaintiff was not deprived of his right to an education because Plaintiff had control over the total length of his removal from the school. (*Id.* ("The length and consequent gravity of a possible deprivation depended solely on how [soon] he obtained his mental health clearance and presented the form to the administrators.").)

Defendants liken Plaintiff's removal to that of a school nurse sending a sick child home from school. (*Id.* at 11-12.) Defendants state that East Brunswick School District's policy is that "[w]hen a child is *suspected* of having a communicable disease," he or she is sent home, and prior to returning to school, that child must "present written evidence of being free of such disease . . . ." (*Id.*) Here, Defendants state that Plaintiff's behavior caused them to suspect he may be a danger to himself or others, and therefore, he was removed from school pending written clearance from a medical professional. (*Id.* at 12.)

Moreover, Defendants contend that Plaintiff "was never actually denied any educational benefit" because he received clearance to return to EBHS on the same day he was removed. (*Id.*

at 12-13 (citing Knable Dep. Tr. 17:22-25, 35:11-13.) In further support, they emphasize that Plaintiff conceded he did not recall missing any schoolwork, receiving poor grades, or having difficulty in graduating as a result of his removal. (Astacio Dep. Tr. 38:17-25; 40:12-23; 40:24-41:10.)

Finally, Defendants argue that to the extent Plaintiff's removal did constitute a deprivation, "such deprivation was trivial or *de minimus* at most." (Defs.' Moving Br. 14.) At bottom, Defendants aver that Plaintiff's procedural due process rights are not implicated because he never suffered a deprivation to his right to a free and public education.

Plaintiff argues that Defendants removing him from school was unreasonable. Namely, relying on school crime and safety statistics, Plaintiff seemingly argues that students are often expelled for conduct involving "a higher degree of offense."[13] (Pl.'s Opp'n Br. 12-14 ("The data so far produces examples of a higher degree of offense and none related to the one in the present case causing expulsion of an otherwise mentally fit student.").) Regarding Defendants analogizing Plaintiff's removal from school to children who are suspected of having a communicable disease, Plaintiff provides, "I[ am] confident that the [C]ourt would not be adverse to taking judicial notice that mental or emotional difficulties are not communicable to others."[14] (*Id.* at 7 n.4.) Finally,

---

[13] Plaintiff does not attach to his opposition brief the United States Department of Education statistics upon which he relies, but rather, cites a secondary resource that references those statistics. (*Id.* (citing Chris Gambrill, et al., *A Review of Court Cases Involving Out-of-School Suspension and Expulsion* (2013),
http://acumen.lib.ua.edu/content/u0015/0000001/0001409/u0015_0000001_0001409.pdf).

[14] Although Plaintiff contends that "mental or emotional difficulties are not communicable to others," Plaintiff cites to school crime and safety reports to support his procedural due process arguments. (Pl.'s Opp'n Br. at 7 n.4.) According to Plaintiff, those reports discuss public schools' disciplinary actions of "weapons related incidents" and "violent incidents[,] include[ing] rape, sexual battery other than rape, physical attack or fight with or without a weapon, threat of physical attack with or without a weapon, and robbery with or without a weapon." (Pl.'s Opp'n Br. 13.) Those reports underscore that even assuming Plaintiff's assertion that "mental or emotional

Plaintiff argues that Defendants removing him from school damaged his reputation.[15] (Pl.'s Opp'n Br. 12 (citing *Goss*, 419 U.S. at 591).)

In *Goss v. Lopez*, students from a public high school brought suit against the school, claiming that their suspensions for up to ten days without a hearing violated their procedural due process rights. *Goss*, 419 U.S. at 568-69. The school districts, however, argued that because there was no constitutional right to a public education, "the Due Process Clause d[id] not protect against expulsions from the public school system." *Id.* at 572.

The Supreme Court ultimately held that although states are not constitutionally required to maintain public school systems, once a state undertakes that responsibility and requires students to attend, the state must "recognize a student's legitimate entitlement to a public education as a property interest protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause." *Id.* at 574.[16] The *Goss* court further held that suspensions "could seriously damage . . . students' standing with

---

difficulties are not communicable" is correct, Plaintiff's allegation ignores the simple fact that mental health issues certainly may *affect* others.

[15] "[T]o make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff must show a stigma to his [or her] reputation *plus* deprivation of some additional right or interest." *Hill v. Borough of Kutztown*, 455 F.3d 225, 236 (3d Cir. 2006). Here, the record lacks any evidence that Plaintiff's reputation was harmed as a result of his removal from EBHS. In fact, Plaintiff himself testified that: Plaintiff's relationship with Nelson remained the same after his removal; he graduated from school on time; and he was able to join the United States Air Force following graduation. (Astacio Dep. Tr. 40:2-23; 40:24-41:10.) Plaintiff, further, could not recall whether his grades suffered as a result of the removal, and is unaware of whether any Defendant discussed the matter outside of the lawsuit. (*Id.* at 60:10-23.) Thus, Defendants have successfully demonstrated an absence of material fact as to whether Plaintiff's reputation was harmed, and Plaintiff has failed to come forward with any evidence, or even argument, refuting that absence. Accordingly, to the extent Plaintiff bases his due process claims on damage to his reputation, those claims fail.

[16] As noted *infra*, courts have found that the Supreme Court's holding in *Goss* is limited to protecting one's right to procedural due process, and not substantive due process. (*See* III.C.)

their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment," and therefore, students have a liberty interest in their reputation. *Id.* at 575.

The Court first notes that Plaintiff uses the terms "suspension" and "expulsion" interchangeably and appears to contend that because Defendants removed Plaintiff from school, he was disciplined in one of those matters. (*See, e.g.*, Pl.'s Opp'n Br. 8.) In support of that assertion, Plaintiff relies on this Court's prior statement that "removal from school . . . **can** be just as harmful as an expulsion." (Oct. 13, 2016 Hr'g Tr. 30:6-12 (emphasis added) (citing *B.S. v. Noor-Ul-Ilman School*, No. 8073-13, 2016 WL 4145921, at *6 (N.J. Super. Ct. App. Div. Aug. 5, 2016).) The Court acknowledges its prior sentiment that a removal from school for an undefined period of time **may** be just as harmful as an expulsion; however, the Court emphasizes that the acknowledgement (which was made in the context of a motion to dismiss for failure to state a claim and preceded discovery) does not conclusively establish that Plaintiff's removal **was** a suspension or expulsion. Rather, the Court merely found persuasive that, under certain circumstances, such as those the New Jersey Superior Court, Appellate Division, confronted in *Noor-Ul-Ilman School*, a removal from school that lacks a defined timeframe could effectively act as an expulsion. 2016 WL 4145921, at *6.

Here, however, Plaintiff has not provided evidence or support for his assertion that Plaintiff's removal was the same as, or similar to, a suspension or expulsion. (*See generally* Pl.'s Opp'n Br.) Furthermore, the court in *Noor-Ul-Ilman School* held that it viewed a child's "removal from school without home instruction, pending a lengthy investigation that continued to the end of the school year, to be just as harmful as an expulsion, as the nature of such a removal places the child in academic limbo, during which his or her education may be jeopardized." 2016 WL 4145921, at *6. Here, the undisputed facts demonstrate that Plaintiff was not subjected to a lengthy

investigation, but rather, was able to leave the school and immediately visit a mental health facility; in fact, Plaintiff received clearance to return to school the very same day he was removed. (*See* Astacio Dep. Tr. 29:12-32:24; *see also* Knable Aff., Ex. C ("Screening Clearance"), ECF No. 49-8.) Therefore, unlike the child in *Noor-Ilman*, who did not have control over the investigatory process, here, Plaintiff was ultimately in control over the length of his removal. *Noor-Ul-Ilman School*, 2016 WL 4145921, at *1-2. (Removal Correspondence at 1 ("Our policy requires that you have your child screened by a mental health professional . . . . Once I have received written clearance from a mental health professional stating he is not a threat to himself, your child will be readmitted to school.").)

Nowhere in Defendants' suicide prevention policy does it state that a student's removal from school constitutes a disciplinary action, instead, it requires staff to perform an assessment to determine the seriousness of the situation. (*See generally* Policy.) Plaintiff has not provided any evidence that this assessment constitutes a suspension or expulsion. The record, accordingly, lacks any indication that Plaintiff's removal from school constituted a disciplinary action, and therefore, the Court declines to classify Plaintiff's removal as either a suspension or expulsion.[17]

---

[17] Even had the Court defined Plaintiff's removal as a disciplinary action, N.J.S.A. 18A:37-2 describes the conduct by which a New Jersey student may be suspended or expelled, and provides:

> Any pupil who is guilty of continued and willful disobedience, or of open defiance of the authority of any teacher or person having authority over him, or of the habitual use of profanity or of obscene language, or who shall cut, deface or otherwise injure any school property, shall be liable to punishment and to suspension or expulsion from school.

N.J.A.C. 6A:16-1.3 provides two categories for suspension—short-term and long-term, and defines short-term suspension as "removal of a student for one but not more than 10 consecutive days" and defines long-term suspension as "removal of a student for more than 10 consecutive school days." Expulsion is defined as "the discontinuance of educational services or the discontinuance of payment of educational services for a student." *Id.* Under this definition, Plaintiff's removal may have been classified as a short-term suspension, thus entitling him solely

### 2. Whether Plaintiff was Deprived of Notice and an Opportunity to be Heard

Defendants argue that even if Plaintiff was deprived of his educational rights, Defendants provided Plaintiff with sufficient notice and an opportunity to be heard, and therefore, "Plaintiff received all the process he was due." (Defs.' Moving Br. 15.) The Court agrees.

Plaintiff contends that he was "summarily removed from his classroom in front of the other students, subjected to an interrogation without even the benefit of a parent being informed and then summarily removed from school. All the 'notice' that Plaintiff was afforded apparently was the questions that he was being asked." (Pl.'s Opp'n Br. 14.) He further provides that Plaintiff was unable "to properly defend himself, much less understand the basis of the[] interrogation," and it was unreasonable for Defendants to expect Plaintiff, a student with a poor academic record, "to hold his own against [Knable—]an individual with an Education Specialist Degree, a learning consultant degree from Rutgers College, and a psychology degree from Montclair State University." (*Id.* at 15 (citing Nelson Aff. ¶ 4; Knable Dep. Tr. 19:16-25, 20:1-12).)

"[P]rocedural due process generally requires that the deprivation of a protected interest 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Marin v. Sec'y of Pa.*, 715 F. App'x 139, 143 (3d Cir. 2017) (citing *Goss*, 419 U.S. at 579). The Supreme Court has held that a student "must be given oral or written notice of the charges against him or her and a student who denies the charges must be given an explanation of the evidence the

---

to the limited procedural due process protections defined in *Goss*. *See Goss*, 419 U.S. at 581 ("Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him, and if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story."). As discussed below, however, Defendants provided Plaintiff with adequate notice and an opportunity to be heard.

authorities have and an opportunity to present his or her side of the story." *S.G. ex rel. A.G. v. Sayreville Bd. of Educ.*, 333 F.3d 417, 424 (3d Cir. 2003) (citing *Goss*, 419 U.S. at 581). Notice may be given at the time of the hearing, and the hearing itself may be informal. *Goss*, 419 U.S. at 582; *see also S.G.*, 333 F.3d at 424. In fact, the Supreme Court has provided that:

> [t]here need be no delay between the time "notice" is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Goss*, 419 U.S. at 582.

Here, the undisputed facts demonstrate Knable and Beltran met with Plaintiff, and at that meeting, discussed his submission of the Story.[18] (Defs.' SUMF ¶¶ 24, 26; *see also* Astacio Dep. Tr. 20:16-21:7; Knable Dep. Tr. 10:19-25, 18:5-7, 22:18-22, 25:2-6; Knable Aff. ¶ 9.) Plaintiff does not provide any explanation as to how or why the meeting he had with Knable and Nelson, which "focused primarily on the [Story] and what prompted Plaintiff to hand it in" was insufficient to constitute an adequate opportunity to be heard, yet merely contends that Plaintiff should not have been expected to "hold his own" against Knable without his parent present. (Defs.' SUMF ¶ 26; Pl.'s Opp'n Br. 15.)

---

[18] Regarding notice, Defendants aver that "Plaintiff was told he was being called down to speak with Mr. Beltran and Ms. Knable about the article he submitted to Nelson." (Defs.' SUMF ¶ 25 (citing Astacio Dep. Tr. 21:1-7).) Plaintiff, without citing to the record, denies that fact. (Pl.'s CSMF ¶ 25.) "If a party fails to . . . properly address another party's assertion of fact . . ., the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). Even if Plaintiff had adequately disputed Defendants' assertion, the Court finds this dispute immaterial because Plaintiff was provided with sufficient notice at the time of his hearing. *See Goss*, 419 U.S. at 582 ("[T]here need be no delay between the time 'notice' is given and the time of the hearing . . . .").

The Supreme Court has explicitly stated it does not believe that "hearings in connection with short suspensions must afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his [or her] own witnesses to verify his [or her] version of the incident." *Goss*, 419 U.S. at 583. In fact, as previously noted, the only requirement is that Plaintiff be "given an opportunity to explain his version of the facts . . . ." *Id.* at 582; *see, e.g.*, *S.B.*, 333 F.3d at 424 ("[The principal] asked each of the boys to explain to her what [the student] had said and done. The boys admitted that they were 'playing guns,' . . . and that they had made statements regarding shooting a gun. That discussion fulfilled the requirements of due process which can be satisfied in a case like this by informal procedure."); *see also C.B. by and Through Breeding v. Driscoll*, 82 F.3d 383, 386 (11th Cir. 1996) (citing *Goss*, 419 U.S. at 583) ("[O]nce school administrators tell a student what they heard or saw, ask why they heard or saw it, and allow a brief response, a student has received all the process that the Fourteenth Amendment demands.").

Moreover, Plaintiff has not provided, nor could the Court independently identify, a requirement that Plaintiff have a parent accompany him to such a hearing. *See, e.g.*, *S.G.*, 333 F.3d at 424 (determining kindergarteners received sufficient notice and hearing even though parents were not present); *see also Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 706-07 (7th Cir. 2002) ("[While] the U[nited] S[tates] Constitution requires a school which suspends a student to provide that student with due process, the process required is minimal. . . . The Constitution does not require pre-suspension parental notification . . . .").

Here, the undisputed facts demonstrate that Knable and Beltran discussed the Story with Plaintiff and inquired into what prompted Plaintiff to submit the Story. This inquiry alone is sufficient to satisfy the procedural due process protections afforded to Plaintiff under the standard

set forth in *Goss*. Thus, the record demonstrates Defendants provided Plaintiff with all the procedural process he was due.[19]

## C.   Plaintiff's Substantive Due Process Claim

Defendants aver that Plaintiff's substantive due process claim fails because there is no fundamental right to a public education under the United States Constitution. (Defs.' Moving Br. 23-25 (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35-36 (1973)).)  Plaintiff counters, arguing that he raised a valid *Monell* claim, and that local school districts may be sued under Section 1983 for violating an individual's civil rights. (Pl.'s Opp'n Br. 10 (citing *Monell v. N.Y.C. Dep't of Social Servs.*, 436 U.S. 658 (1978); *Tex. Teachers Ass'n v. Garland Sch. Dist.*, 489 U.S. 782 (1989)).)[20]

---

[19] The Supreme Court has also recognized instances when there must be flexibility regarding the timing of the notice and hearing, and has provided that:

> there are recurring situations in which prior notice and hearing cannot be insisted upon.  Students whose presence poses a continuing danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.  In such cases, the necessary notice and rudimentary hearing should follow as soon as practicable . . . .

*Goss*, 419 U.S. at 582-83. Here, Plaintiff may have been provided with sufficient notice and hearing during his reentry conference. (*See, e.g.,* Defs.' SUMF ¶ 58 ("Plaintiff returned to school on Friday, May 2, 2014, at which time . . . Beltran and . . . Knable held a reentry conference with Plaintiff and his mother to discuss the mental health clearance and recommendation he received.").) The Court, however, need not reach that issue because it finds Plaintiff received sufficient notice and an opportunity to be heard prior to his removal.

[20] Regarding Plaintiff's *Monell* allegations, the Court first notes Plaintiff's Amended Complaint is completely devoid of such a claim. (*See generally* Am. Compl.)  Plaintiff's Count One—42 U.S.C. § 1983—however, provides: "The conduct of Defendants, as aforesaid violated the policies of EBHS under color of law, and constitutional rights of Plaintiff, including due process, and constituted deviations from accepted standards." (*Id.* ¶ 66.)  Assuming Plaintiff successfully invoked a *Monell* claim against Defendants, Plaintiff's claim fails because he is unable to demonstrate a constitutional violation occurred, and further failed to specifically identify a custom or policy at issue. *See, e.g., B.D. v. Downington Area Sch. Dist.*, No. 15-6375, 2016 WL 3405460, at *6 (E.D. Pa. June 21, 2016) (citing *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996)).

The Supreme Court has held that there is no fundamental right to an education. *San Antonio*, 411 U.S. at 35 ("Education . . . is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected."); *see also Plyler v. Doe*, 457 U.S. 202, 221 (1982). "While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, substantive due process rights are created only by the Constitution." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 229 (1985) (citation omitted).

Here, Plaintiff's property interest in receiving a free public education is derived from New Jersey law, and not the United States Constitution. Therefore, Plaintiff is unable to raise a substantive due process claim. *See, e.g.*, *Through Breeding*, 82 F.3d at 387 (determining that a suspended student's "effort to invoke substantive due process fail[ed]" because there is no fundamental right to attend a public school); *see also M.M. v. Tredyffrin/Easttown Sch. Dist.*, No. 06-1966, 2006 WL 2561242, at *12 (E.D. Pa. Sept. 1, 2016) (collecting cases); *Flynn v. Terrebonne Parish Sch. Bd.*, No. 03-2500, 2004 WL 2009277, at *4 (E.D. La. Sept. 8, 2004) (finding that the plaintiff's claim failed, in part, because the right to attend public school is not a fundamental right for the purposes of substantive due process); *cf. Homar v. Gilbert*, 63 F. Supp. 2d 559, 574-76 (M.D. Pa. 1999) (collecting cases and finding that tenured public employment at a university is not a fundamental property interest protected by substantive due process). Accordingly, Plaintiff's substantive due process claim fails.

_____

("In order to hold a municipality, or in this case a school district, liable for a constitutional violation under *Monell*, a plaintiff must allege that the violation of constitutional rights was caused by a policy, custom, or practice of the municipality.").

## VI.  Conclusion

For the reasons set forth above, the Court grants Defendants' Motion for Summary Judgment. Because the Court grants summary judgment in Defendants' favor, the Court need not address Defendants' qualified immunity arguments. (*See* Defs.' Moving Br. 5-7.) The Court will enter an Order consistent with this Memorandum Opinion.


s/ Michael A. Shipp

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**Dated:** August 15, 2019